**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| FOUR POINTS COMMUNICATION SERVICES, INC., | ) ) ) ) ) | |
| Plaintiff, | ) ) | No. 4:13-CV-1003 JAR |
| v. | ) ) ) | |
| BRYAN BOHNERT, et al., | ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This matter is before the court on Defendants' Motion for Summary Judgment (ECF No. 28) and Defendants' Motion for Leave to File Their Motion to Strike the Expert Report of Kristopher Bleich (ECF No. 63). This matter is fully briefed and ready for disposition.

## BACKGROUND

Plaintiff Four Points Communications Service, Inc. ("Plaintiff") is a contractor who engineers, furnishes and installs various types of communications systems, primarily to the military. (Defendants' Statement of Uncontroverted Material Facts in Accordance with Local Rule 7-4.01(c) ("DSUMF"), ECF No. 30, ¶2). Plaintiff was formed in April 1999 by Thomas Foreman, Harry Groppel, and Kevin Pinson. (DSUMF, ¶1). Defendant Bryan Bohnert was Plaintiff's Vice President of Business Development. (DSUMF, ¶4). Plaintiff alleges that it hired Defendant Cory Cannon as a draftsman and network computer engineer from February 2011 through February 2013, and that Bohnert was Cannon's immediate supervisor. (First Amended Complaint, ECF No. 68, ¶¶5, 7).

At issue in this case is whether Defendant Bohnert's development of the Site Survey Assistance Manager ("SSAM") software was "work for hire" by Plaintiff or whether Defendant Bohnert developed the SSAM software on his own time and independent of his employer, Plaintiff. Plaintiff alleges that Cannon used FileMaker Pro to develop the SSAM while employed by Plaintiff. (PSAMF, ¶12).[1]

> Bohnert signed an Employment Agreement, which provided in part:

> Employee acknowledges that any opportunity, in any way related to the business of the Company, of which he becomes aware during the Employment Period shall be considered to be an opportunity of the Company….Employee further agrees that, during the Employment Period, he will refer to the Company all ideas, procedures or work of any nature related to the business of the Company (which then become the exclusive property of the Company) which may come to the attention of Employee or be under the control of Employee, but Employee understands that the Company shall have the right to accept or reject any such ideas, procedures or work within its sole discretion and to set fees related thereto.

(First Amended Complaint, ECF No. 68, ¶9).

Part of Bohnert's job description included networking with contacts and learning about requests for proposals to bring new business to Plaintiff. (DSUMF, ¶4). Defendants contend that Bohnert's job description did not include software development. (DSUMF, ¶9). Plaintiff denies this limitation and asserts that Bohnert's job included all tasks assigned to him by the president of the company, Thomas Foreman, and the Board. (PSUMF, ¶9). Mr. Foreman was Bohnert's direct boss while he worked for Plaintiff. (DSUMF, ¶5).

Prior to Bohnert's employment with Plaintiff, Plaintiff's field engineers performed surveys with note pads. (DSUMF, ¶14). When he began working for Plaintiff in October 2007, Bohnert emailed a CITS survey form to several members of Plaintiff. (DSUMF, ¶15). The proposed SSAM application is a digitalized form of the CITS checklist, which has been revised,

---

[1] The Court references Plaintiff's Responses and Objections to Defendants' Statement of Uncontroverted Material Facts as "PSUMF" and Plaintiff's Statement of Additional Material Facts as "PSAMF". <u>See</u> ECF No. 39.

modified, and supplemented over time. (DSUMF, ¶18; PSUMF, ¶18). The CITS survey form was a standard form used to assist engineers in performing surveys and make the process more uniform. (Id.) On June 20, 2011, Bohnert filed a Certificate of Registration with the U.S. Copyright Office for a document titled CITS Based Survey Checklist. (DSUMF, ¶16). Plaintiff states that it contributed substantially to the form and that Bohnert placed a Four Points copyright on the form and the form was used with Four Points' copyright mark for years. (PSUMF, ¶16).

In the summer of 2011, while they were employed by Plaintiff, Cannon and Bohnert made a PowerPoint presentation to Mr. Foreman, Mr. Groppel, and Mr. Pinson regarding the digitalization of the CITS checklist form. (PSAMF, ¶¶11, 19; DSUMF, ¶¶17, 19). Plaintiff claims that prior to this presentation Mr. Foreman and Bohnert had been discussing digitalizing Plaintiff's survey form and presenting this project to a company named Black Box. (PSUMF, ¶17). In fact, Mr. Foreman and Bohnert presented the concept of a digitalized survey form to Black Box in early June 2011. (PSAMF, ¶4).

Bohnert claims that he talked to Mr. Foreman, Mr. Groppel, and Mr. Pinson about forming a separate entity that would be the owner of the SSAM technology and that Bohnert would own 60% of this entity and Plaintiff would own 40%. (DSUMF, ¶20). Plaintiff states that it rejected Bohnert's idea of a separate entity. (PSUMF, ¶20). Bohnert claims that this project was not high on Plaintiff's priorities. (DSUMF, ¶21). Plaintiff disclaims this idea and says that it thought this project could bring value to the services it provides. (PSUMF, ¶21). Eventually Bohnert told Cannon that Plaintiff was no longer interested in the development of the site survey tool application, and Cannon never discussed this development with anyone at Four Points other than Bohnert. (PSAMF, ¶¶ 28, 30). Bohnert claims that he moved forward with the SSAM

development after Plaintiff refused to contribute to the development costs, including purchase the domain named www.ssam.us.com. (DSUMF, ¶25).

Bohnert claims that he presented Mr. Foreman with a proposed budget in the range of $20,000-$30,000 for developing the SSAM application. (DSUMF, ¶24). Bohnert claims that Plaintiff did not incur any expenses in developing the SSAM technology, other than Bohnert's salary. (DSUMF, ¶23).

In response, Plaintiff claims that it paid Bohnert's salary, Cannon's wages and expenses, paid the costs of the beta testing of the SSAM technology at Fort Gordon, purchased iPads for using the application, and paid for the engineering and design experience that went into the development of the project. (PSUMF, ¶23). Plaintiff contends it was never presented with any bills for Bohnert's purported development costs. (PSUMF, ¶27). Plaintiff claims that Bohnert never presented a budget, just conversations about the possible costs of the project. (PSUMF, ¶24). Plaintiff denies that it refused to fund the SSAM project, but that its employee, Cannon, was obtaining bids from software developers. (PSUMF, ¶25). In fact, Bohnert and Cannon had discussions with and received proposals from several companies, including Black Box, Appiction, Copper Mobile, Inc., [x]cube LABS, Booze/Allen/Hamilton, and RareWire regarding development of the SSAM technology on behalf of Plaintiff. (PSAMF, ¶¶14-26). For example, Cannon sent an email to Kirk Hasenzahl, President of RareWire, LLC, dated February 2, 2012, attaching a non-disclosure agreement between Plaintiff and RareWire requiring confidential information concerning a project titled "SSAM: Apple iPad App." (PSUMF, ¶26). This non-disclosure agreement was signed by Bohnert as Vice President of Four Points. (PSUMF, ¶26).

In April 2012, Bohnert purchased FileMaker software, a personal computer, iPads, lap top computers, and back-up storage for the laptop, with his own funds to develop the SSAM

technology. (DSUMF, ¶¶27-28). Bohnert also contends that he hired and paid a software developer, Ryan Dunse, to train him on FileMaker software to develop SSAM. (DSUMF, ¶29). Bohnert claims that he worked on developing the SSAM technology on evenings and weekends, outside of his working hours for Plaintiff. (DSUMF, ¶30).

Plaintiff contends that by the time that Bohnert hired Dunse the SSAM application used at military bases for surveying was almost completed by Cannon. (PSUMF, ¶29). In response to Defendants contention that Bohnert worked on SSAM "on his own time," Plaintiff points out that Bohnert was a salaried employee, with a base salary of at least $100,000 per year. (PSUMF, ¶30).

Bohnert told Mr. Foreman that Plaintiff could test the SSAM application on a proposed project at Fort Campbell, but that project never came to fruition. (DSUMF, ¶¶32-33). Bohnert claims that Mr. Foreman told Bohnert that Plaintiff wanted something in writing stating that it did not have to pay Bohnert to use the SSAM application and that Mr. Foreman also wanted the product loaded on to Plaintiff's, not Bohnert's, iPads. (DSUMF, ¶34). Mr. Foreman claims that he wanted the SSAM technology on Plaintiff's iPads because it was a company project. (PSUMF, ¶34). Bohnert purchased two iPads using Plaintiff's funds. (DSUMF, ¶35). The SSAM technology was first used in October 2012 at a project at Fort Gordon. (DSUMF, ¶36). Bohnert claims that he let Plaintiff use the SSAM application for the Fort Gordon project without charge as a "beta test" before selling it on a commercial basis. (DSUMF, ¶31). Bohnert claims that he executed an Intellectual Property/Software License Agreement ("License Agreement") on behalf of Defendant Rapid Jack, and Mr. Scott Roehrig, Plaintiff's operations manager, executed the same document on behalf of Plaintiff. (DSUMF, ¶37). The License Agreement purported to grant Plaintiff a one year use of the SSAM application. (PSUMF, ¶38). Bohnert claims that Mr.

Roehrig was second in command under Mr. Groppel over operations for Plaintiff. (DSUMF, ¶40).

Plaintiff claims that Mr. Roehrig was not "second in command" but that he reported directly to Mr. Groppel. (PSUMF, ¶40). Plaintiff states that Mr. Roehrig, an employee of Plaintiff, did not know what the License Agreement was and that Mr. Roehrig signed it at the directive of Bohnert, the Vice President of Plaintiff, in order to take the iPads. (PSUMF, ¶37). Mr. Roehrig did not read the License Agreement prior to signing it. (DSUMF, ¶46; PSUMF, ¶46). Mr. Roehrig was not given a copy of the License Agreement. (PSUMF, ¶37). Rapid Jack was not in existence at the time the License Agreement was executed. (PSUMF, ¶37). Mr. Roehrig did not receive any discipline from Plaintiff for signing the License Agreement, other than counseling from Mr. Foreman regarding Mr. Roehrig's lack of authority to sign contracts. (PSUMF, ¶57).

On May 23, 2013, Plaintiff filed a one-count Complaint for Declaratory Judgment Regarding Ownership of Copyright against Defendants Bryan Bohnert and Rapid Jack Solutions, Inc. (ECF No. 1). On September 11, 2013, Defendants filed their Counterclaim against Plaintiff for Declaratory Judgment Regarding Ownership of the SSAM technology. (ECF No. 17). On July 29, 2014, Plaintiff was granted leave to file a First Amended Complaint that added Cory Cannon as a defendant, alleging that Cannon created a "substantial portion of the source code for SSAM." (ECF Nos. 67-68).

## DISCUSSION

## I.    MOTION FOR SUMMARY JUDGMENT[2]

---

[2] The Motion for Summary Judgment was filed on December 31, 2013. (ECF No. 28). On July 29, 2014, this Court granted Plaintiff's Motion for Leave to Add Defendant and to File Its First Amended Complaint (ECF Nos. 67-68), which added Cory Cannon as a defendant. Although the

### A. Summary Judgment Standard

The Court may grant a motion for summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Citrate, 477 U.S. 317, 322 (1986); Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011). The substantive law determines which facts are critical and which are irrelevant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Only disputes over facts that might affect the outcome will properly preclude summary judgment. Id. Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id.

A moving party always bears the burden of informing the Court of the basis of its motion. Celotex Corp., 477 U.S. at 323. Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute." Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at 248. The nonmoving party may not rest upon mere allegations or denials of his pleading. Anderson, 477 U.S. at 258.

In passing on a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in his favor.

---

Motion for Summary Judgment was filed prior to the filing of the First Amended Complaint, the parties agreed that the new complaint does not affect the legal issues involved in the Motion for Summary Judgment and agreed that the Court can consider the Motion for Summary Judgment. See Joint Memorandum Acknowledging the Filing of Plaintiff's First Amended Complaint Does Not Affect the Court From Ruling on Defendant Bryan Bohnert and Defendant Rapid Jack Solutions Inc.'s Motion for Summary Judgment, ECF No. 76. Thus, with the consent of the parties, the Court rules on Defendants' Motion for Summary Judgment even though it was filed prior to the entry of the First Amended Complaint. For purposes of this Motion, the Court will refer to defendants Bryan Bohnert and defendant Rapid Jack Solutions, Inc. as "Defendants".

<u>Celotex Corp.</u>, 477 U.S. at 331.   The Court's function is not to weigh the evidence but to determine whether there is a genuine issue for trial.   <u>Anderson</u>, 477 U.S. at 249.  "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'"   <u>Torgerson</u>, 643 F.3d at 1042 (quoting <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)).

## B.  Work for Hire

In the First Amended Complaint, Plaintiff alleges that SSAM is an "original work subject to the protections of the United States Copyright Act, 17 U.S.C. §101 et seq." and that "Plaintiff claims the sole and exclusive ownership of the copyright in the source code for SSAM pursuant to 17 U.S.C. §201(a)." (First Amended Complaint, ¶¶22-23).   The Copyright Act extends copyright protection to "original works of authorship fixed in any tangible medium of expression...." 17 U.S.C. § 102(a).   "As a general rule, the author is the party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection." <u>Cmty. For Creative Non–Violence v. Reid</u>, 490 U.S. 730, 737 (1989).   Copyright ownership "vests initially in the author or authors of the work," unless the work is "made for hire." <u>Vintage Verandah, Inc. v. Mastercraft Int'l, Inc.</u>, 4:04CV00066 WRW, 2006 WL 3735975, at *2 (E.D. Ark. Dec. 15, 2006)(citing 17 U.S.C. §206(a)-(b)).   A work is "made for hire" if it is "prepared by an employee within the scope of his or her employment." <u>Vintage Verandah, Inc.</u>, 2006 WL 3735975, at *2 (citing 17 U.S.C. §101).   "In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright."   17 U.S.C.

§201(b). In their Motion for Summary Judgment, Defendants assert that Bohnert's development of the SSAM application was not work for hire.[3]

In analyzing whether a creation constitutes work made for hire, the Court examines three factors.

> As expressed in Section 228 of the *Restatement,* the key principle is that a servant's conduct is within the scope of employment "only if: (a) it is of the kind he is employed to perform; (b) it occurs substantially within the authorized time and space limits; [and] (c) it is actuated, at least in part, by a purpose to serve the master."

Rouse v. Walter & Associates, L.L.C., 513 F. Supp. 2d 1041, 1056 (S.D. Iowa 2007)(quoting Avtec Sys., Inc. v. Peiffer, 21 F.3d 568, 571 (4th Cir. 1994)); see also Kirk v. Harter, 188 F.3d 1005, 1007 (8th Cir. 1999)(noting that the court examines several factors to determine employment status, including the hiring party's right to control the manner and means by which the product is accomplished; the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party). "No single factor is determinative of employment status." Kirk, 188 F.3d at 1007. As discussed below, the Court holds that issues of fact exist as to all three factors that preclude entry of summary judgment in favor of Defendants.

(1) Was the Work the Kind of Work that Plaintiff was Employed to Perform?

---

[3] The Court notes that there is dispute over whether Bohnert or Cannon was the author of the SSAM technology, but this is not relevant for purposes of Defendants' motion.

Defendants argue that Bohnert's purported development of the SSAM technology was not part of his regular job duties. Defendants claim that Bohnert's job duties as Vice President of Business Development did not include software development. (ECF No. 29 at 20). Defendants also note that, after Bohnert's resignation, Plaintiff hired an outside software development company to replicate the SSAM technology. (ECF No. 29 at 20). The individual who replaced Bohnert as Vice President of Business Development was not in charge of this project. (Id.). Defendants point out that no other employee of Plaintiff has developed any software applications or technology. (Id.). Finally, Defendants state that Cory Cannon was a drafter, not a software developer. (ECF No. 60 at 18).

In response, Plaintiff argues that Bohnert was employed to perform any work that he was assigned and his job description was not limited to sales. Plaintiff asserts that Mr. Foreman assigned Bohnert with the task of leading the development of digitalization of the CITS Survey. (ECF No. 38 at 3, 11). Further, Cannon, who Plaintiff alleges actually authored the SSAM source code, was hired as a computer draftsman and Plaintiff paid for his training on different computer programs. (ECF No. 38 at 7-9). Plaintiff contends that Cannon was acting within the scope of his employment and at the direction of his supervisor, Bohnert, when he developed the SSAM technology. (ECF No. 38 at 9).

The Court finds that an issue of fact exists as to whether this factor supports a finding that the development of the SSAM technology was within the job descriptions of Defendants Cannon and Bohnert. Plaintiff has presented evidence that Bohnert was required to do anything assigned to him, including developing the survey system as a digitalized application and that Cannon actually created the SSAM survey during his employment with Plaintiff. In turn, Defendants have presented evidence that Bohnert was in a sales position, which did not include any software

development, and that Cannon was a computer draftsman, not a programmer. These are issues for the fact finder to determine and which the Court cannot resolve as a matter of law. The Court finds that this factor favors denial of Defendants' Motion for Summary Judgment on Plaintiff's work for hire claim.

(2) <u>Did the Work Occur Substantially Within the Authorized Time and Space Limits of the Job?</u>

Defendants also claim that Bohnert funded and developed the SSAM technology "entirely independent of Plaintiff." (ECF No. 29 at 21). Bohnert asserts that, after Mr. Foreman refused to contribute financially to the SSAM development efforts, that Bohnert made substantial purchases (computers, iPads, printers, FileMaker Pro) and hired a software developer. (<u>Id.</u>).

Defendants also assert that the evidence demonstrates that Bohnert developed the SSAM technology during his off-time and nonworking hours. (ECF No. 22). Bohnert testified he worked two hours per night during the week and seven hours a day on Saturday. (<u>Id.</u>). Defendants refer to witnesses' testimony that they never saw Bohnert working on the SSAM technology at Plaintiff's offices. (<u>Id.</u>). Defendants also emphasize that, according to Ms. Theobald, a real estate professional who was interested in the SSAM technology for her field, Bohnert refused to even discuss the SSAM concept at work and he insisted that they use his personal email account when discussing SSAM. (<u>Id.</u>).

In response, Plaintiff asserts Defendants' argument fails because Bohnert and Cannon were working on the development of the SSAM while they were Plaintiff's employees. (ECF No. 38 at 9). Plaintiff states that, while employed at Four Points, Mr. Foreman directed Bohnert to work on getting the SSAM survey tool developed. (ECF No. 38 at 8-9). Likewise, Plaintiff argues that Cannon was hired by Plaintiff as a computer draftsman and that Plaintiff paid for Cannon's training to become certified as a computer network engineer. (ECF No. 38 at 9). Plaintiff

claims that Bohnert, as Cannon's direct supervisor, asked Cannon to assist him in developing the SSAM survey tool, which he did. (ECF No. 38 at 9). Plaintiff contends that it incurred costs for the development of the SSAM technology. Specifically, Plaintiff paid the cost of Bohnert's salary and Cannon's wages. Further, Plaintiff asserts that Mr. Foreman tasked Bohnert with leading the development of this technology, but that Bohnert never asked for any funding for his expenditures. (ECF No. 38 at 3, 11). In addition, Plaintiff states that Defendants' argument that Bohnert did not work on the SSAM technology at work and only discussed it outside of the office also can cut in favor of Plaintiff. Plaintiff contends that Bohnert's refusal to disclose to Plaintiff his work on the SSAM technology indicates that Bohnert was trying to keep it a secret because he knew it was contrary to his employment agreement. Further, Plaintiff contends that the survey tool application was prepared for its benefit because the survey process was a part of Plaintiff's business. (ECF No. 38 at 7-8).

   The Court finds that an issue of fact also exists as to this factor. The parties have both presented evidence that they incurred costs to develop the SSAM technology. In addition, the parties have presented contradictory information regarding whether Plaintiff approved and facilitated the development of the SSAM technology. The Court also does not believe that Plaintiff's work on the SSAM technology outside of Plaintiff's offices is dispositive of this factor. An employee cannot establish copyright ownership rights solely on the basis that the work was done at home on off-hours. Avtec Sys., Inc., 21 F.3d at 571.

> Neither case law nor the legislative history suggests that a person can avoid the "work made for hire" doctrine merely by preparing the work during nonworking hours or in a facility not controlled by the employer. The mere fact that preparations were done outside an employee's office or normal working hours does not remove such preparations from the scope of employment.

Marshall v. Miles Labs., Inc., 647 F. Supp. 1326, 1330 (N.D. Ind. 1986); Rouse v. Walter & Associates, L.L.C., 513 F. Supp. 2d 1041, 1058 (S.D. Iowa 2007)(same); see also In re Simplified Info. Sys., Inc., 89 B.R. 538, 542 (W.D. Pa. 1988) (citing Marshall v. Miles Laboratories Inc., 647 F.Supp. 1326 (N.D. Ind. 1986) ("[T]he 'work made for hire' doctrine is not avoidable merely by performing the work in a separate location, or on non-work time."). The Court finds that Bohnert's effort to keep his development of the SSAM technology separate from his work for Plaintiff could be interpreted as Bohnert hiding his unlawful side project from his employer. Thus, the Court does not believe that Bohnert meeting potential clients outside of work favors summary judgment for Defendants. Because there is contradictory evidence regarding whether Bohnert and Cannon developed the SSAM technology under Plaintiff's auspices and direction, the Court finds that this factor does not support entry of summary judgment.

(3) Was the Work Actuated Substantially, at Least, in Part By a Purpose to Serve the Employer?

Defendants claim that Bohnert's primary motivation in developing SSAM was his own "entrepreneurial purposes." (ECF No. 29 at 22). He claims that he allowed Plaintiff to use the SSAM technology only for the purpose of "beta testing" the SSAM product in the marketplace, as evidenced by the limited one-year license he provided Plaintiff. (Id.). Defendants also note that SSAM technology has been utilized in fields other than the site survey process, including weddings, real estate, and equine fields. (ECF No. 60 at 22).

In response, Plaintiff states that "[t]here is no dispute that the survey tool application was prepared for the benefit of Four Points." (ECF No. 38 at 7; see also ECF No. 40-1 at 50 (Bohnert testified that Mr. Foreman directed Bohnert to look into getting the CITS form

converted into a digital form in June 2011)).  Plaintiff maintains that improving the survey was done to benefit Four Points, particularly because it would allow Four Points to win more work and add value to its services.  (ECF No. 38 at 8).

As with the other two factors, the Court finds that this factor must be determined by a fact finder, not as a matter of law.  The parties have presented conflicting evidence regarding whether Plaintiff directed Bohnert to develop the SSAM technology and Plaintiff's motivation for developing the SSAM technology.  The Court cannot make this determination as a matter of law based upon the record.  Therefore, the Court will deny summary judgment on this basis.

**C.  License Agreement**

Even if this Court finds that SSAM is a work for hire, Defendants assert that Plaintiff still is not entitled to copyright protection because the parties have "expressly agreed [that SSAM is not a work for hire] in a written agreement signed by them."  (ECF No. 29 at 23); see 17 U.S.C. §201(b).  Section 201(b) states that, in a work for hire situation, the employer owns the copyright "unless the parties have expressly agreed otherwise in a written instrument signed by them." Section "201(b) requires that an agreement altering the statutory presumption be both *written* and *express.* In essence, this provision is a statute of frauds."  Baltimore Orioles, Inc. v. Major League Baseball Players Ass'n, 805 F.2d 663, 672 (7th Cir. 1986)(emphasis in original).

Defendants assert that the License Agreement between the parties fulfills the requirements of §201(b) because both parties executed the License Agreement and both parties agreed in the License Agreement that "Defendant [Rapid Jack] 'has developed and licenses to users its Intellectual Property, listed under the name[] Site Survey Assistance Manager.'"  (ECF No. 29 at 23 (quoting the License Agreement)).

Defendants further assert that Mr. Roehrig had apparent authority to execute the License Agreement on behalf of Plaintiff. (ECF No. 29 at 24); see also Pinkham v. Sara Lee Corp., 983 F.2d 824, 830 (8th Cir. 1992)(citing Restatement of Agency)("[A]pparent authority to do an act is created as to a third person by written or spoken words or any other conduct *of the principal* which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him."). Defendants argue that Mr. Roehrig was second in command in operations for Plaintiff. He supervised in excess of thirty employees, made $75,000 per year, and was directly responsible for the Fort Gordon project. Defendants argue that it was "entirely logical" for Bohnert to present the License Agreement to Mr. Roehrig because he was the one that was running the Fort Gordon jobsite where the SSAM technology would be used. (Id.) Both Mr. Roehrig and his direct supervisor, Mr. Groppel, stated that they considered Mr. Roehrig to be a member of management. (Id.). Defendants assert that Mr. Roehrig believed at the time that he executed the License Agreement that he had the authority to do so and that Mr. Roehrig was not disciplined for executing the License Agreement. (ECF No. 29 at 25). Defendants also point to an email from Bohnert to Mr. Roehrig that stated, "Allright then. I will shoot to have two Ipads, protective gear, users guide and a license on your desk by tomorrow night if possible but for sure on Saturday," as evidence that Mr. Roehrig did not sign the License Agreement by mistake. (ECF No. 60 at 10). Defendants also state that Mr. Roehrig's failure to read the License Agreement is not a defense to effect of the License Agreement. See ECF No. 60 at 10 (citing Repair Masters Const., Inc. v. Gary, 277 S.W.3d 854, 858 (Mo. Ct. App. 2009)("A party capable of reading and understanding a document is charged with the knowledge of its contents if he or she signs it, even if the party fails to review it.")). In addition, Defendants note that Plaintiff has not previously taken any

steps to terminate or repudiate the License Agreement. Defendants further argue that signing License Agreements was part of Plaintiff's job description because his job duties included "entering into and overseeing material or equipment providers and subcontractors." (ECF No. 60 at 2).

In response, Plaintiff contends that Mr. Roehrig had no authority, express or implied, to bind Four Points with respect to the License Agreement. (ECF No. 38 at 12-15). Plaintiff states that Mr. Roehrig, Mr. Groppel, and Mr. Foreman all testified that Mr. Roehrig did not have authority to act on Plaintiff's behalf regarding this type of contract or agreement. (ECF No. 38 at 12-13).[4] Plaintiff also notes that Rapid Jack was not even in existence at the time the License Agreement was signed and that Bohnert has never organized a company named Rapid Jack. (ECF No. 38 at 13).

Further, Plaintiff argues that the License Agreement is void because Bohnert presented the License Agreement to Mr. Roehrig in bad faith. (ECF No. 38 at 13-14)(citing Essco Geometric v. Harvard Indus., 46 F.3d 718, 726 (8th Cir. 1995)("Under Missouri law, apparent authority is created by the conduct of the principal which causes a third person reasonably to believe that the purported agent has the authority to act for the principal, and to reasonably and in good faith rely on the authority held out by the principal."). Plaintiff claims that Bohnert, as Vice President of Four Points, presented the License Agreement under false pretenses to Mr. Roehrig. Plaintiff contends that Mr. Roehrig believed he was following the directive of Bohnert as Vice President of Four Points (making Bohnert the superior of Mr. Roehrig), and that Mr. Roehrig had no knowledge of the License Agreement for the SSAM technology. Mr. Roehrig testified that he did not read the License Agreement. Bohnert did not give Mr. Roehrig a copy of the License

---

[4] Mr. Roehrig testified at his deposition that he did not have any authority to give up any rights that Four Points had to any property. (ECF No. 42-4 at 34).

Agreement and Bohnert did not disclose the License Agreement until he was leaving Plaintiff's employment.

Whether an agency relationship exists is a mixed question of law and fact. <u>Am. Prairie Const. Co. v. Hoich</u>, 560 F.3d 780, 793 (8th Cir. 2009).

> When the facts relied upon to establish the existence of an agency are undisputed, and conflicting inferences cannot be drawn from them, the question of the existence of an agency is one of law for the court. On the other hand, when the facts pertaining to the existence of an agency are conflicting, or conflicting inferences may be drawn from the evidence, the question is one of fact for the jury, or for the court as the trier of fact if the case is tried without a jury.

3 Am.Jur.2d *Agency* § 352; <u>Am. Prairie Const. Co</u>, 560 F.3d at 793; <u>CIT Fin. Servs., Inc. v. Gott</u>, 615 P.2d 774, 779 (1980)("Where the existence of an agency is disputed, its existence or non-existence is ordinarily a question of fact for the jury to be determined on proper instructions.").

Recognizing that the existence of an agency relationship is a question of fact for a fact finder to determine and based upon the evidence presented by both sides, the Court finds that an issue of material fact exists as to whether Mr. Roehrig had apparent authority to enter into the License Agreement with Defendants. Further, the Court finds that an issue of fact exists as to whether entering into intellectual property contracts was within Mr. Roehrig's job description. Clearly, he had the authority to accept equipment and materials from contractors and subcontractors, but it is unclear from the record whether he had the authority execute the License Agreement and potentially to sign away Plaintiff's intellectual property rights in the SSAM. Likewise, an issue of fact exists as to whether Bohnert was acting in good faith when he presented the License Agreement to Mr. Roehrig for signature. Defendants have presented evidence that Bohnert emailed Mr. Roehrig about the License Agreement prior to having him sign it, but Plaintiff has also provided evidence that Mr. Roehrig did not know what the License Agreement was and that he was simply acting in accordance with the direction of his superior,

Bohnert.   Based upon the conflicting record before it, the Court denies Defendants' Motion for

Summary Judgment.

II.        **MOTION TO STRIKE/DAUBERT MOTION**[5]

        **A.  Standard Under <u>Daubert</u>**

        The admission of expert testimony in federal court is governed by Federal Rule of

Evidence 702:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

<u>See</u> <u>Clark v. Heidrick</u>, 150 F.3d 912, 915 (8th Cir. 1998).  Doubt regarding "whether an expert's

testimony will be useful should generally be resolved in favor of admissibility." <u>Id</u>. (citation and

internal quotation omitted).   In <u>Daubert</u>, the Supreme Court explained that in examining an

expert's opinions for admissibility, trial courts should consider the following criteria: (1) whether

the theory being offered by the expert has been tested; (2) whether the theory has been subjected

to peer review, publication, or analysis by others considered experts in the field; (3) whether the

theory has a "known or potential rate of error"; and (4) whether the theory has been generally

accepted by others in the field.   <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579, 593-94,

113 S. Ct. 2786, 2796-97 (1993).   "The proponent of the expert testimony must prove its

---

[5] This motion is entitled "Defendants' Motion for Leave to File Their Motion to Strike the Expert Report of Kristopher Bleich" (ECF No. 63).  In addition to addressing whether Defendants could file such a motion, the parties also fully briefed the merits of the Motion to Strike, which really is a <u>Daubert</u> motion.   The Court grants Defendants leave to file their Motion to Strike and addresses the merits of the motion herein.

admissibility by a preponderance of the evidence." Lauzon v. Senco Prods., Inc., 270 F.3d 681, 686 (8th Cir. 2001) (citing Daubert, 509 U.S. at 592, 113 S. Ct. at 2796). "'The exclusion of an expert's opinion is proper only if it is so fundamentally unsupported that it can offer no assistance to the jury.'" Sappington v. Skyjack, Inc., 512 F.3d 440, 448 (8th Cir. 2008) (quoting Wood v. Minn. Mining & Mfg. Co., 112 F.3d 306, 309 (8th Cir. 1997)).

B. **Discussion**[6]

Plaintiff has designated Kristopher Bleich as its expert witness to offer his opinion as to whether the software application (FileMaker Pro) that was used to create SSAM has the functional equivalent of source code, even though it does not contain source code as the term is traditionally defined. (ECF No. 63-1 at 1). Defendants ask this Court to strike the report of Mr. Bleich. Defendants claim that Mr. Bleich's testimony should be excluded because he failed to examine the software program, FileMaker Pro 12, which was used to create the SSAM. (ECF No. 75 at 3). Instead, Mr. Bleich utilized FileMaker Pro 13. Mr. Bleich claims that the version of FileMaker Pro would not make a difference to his opinion. (ECF No. 65 at 5). Plaintiff notes that FileMaker Pro has its own source code, which is the same no matter the version used. (Id.) Defendants, however, point out that Mr. Bleich never reviewed the other FileMaker Pro versions so he cannot state that examining a different version would change his opinion. (ECF No. 75 at 3).

The Court will deny Defendants' Motion to Strike. Mr. Bleich is a well-qualified expert whose credentials are not in dispute. (ECF No. 65 at 4). Instead, Defendants take issue only with the version of FileMaker Pro that Mr. Bleich used when evaluating FileMaker Pro. The Court

---

[6] Defendants filed their Motion to Strike the Expert Report of Kristopher Bleich twenty one days after the deadline expired. (ECF No. 75 at 1). The Court finds that Plaintiff has suffered no prejudice from this delay and this issue is fully briefed and ready for disposition.

finds that this factual issue goes only to the credibility of Mr. Bleich's expert opinion, which can be addressed through expert cross-examination. See Larson v. Kempker, 414 F.3d 936, 941 (8th Cir. 2005)("the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination")(citation omitted). The Court does not believe that Mr. Bleich's testimony is so fundamentally unsupported that it can offer no assistance to the jury. See Loudermill v. Dow Chem. Co., 863 F.2d 566, 570 (8th Cir. 1988)("only if an expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded."). Rather, the Court holds that Mr. Bleich's testimony, even if it is addressing a different version of FileMaker Pro, is relevant to the issue of whether any source code existed for the SSAM survey software. Therefore, the Court denies Defendants' Motion to Strike. The Court also gives Plaintiff seven (7) days to correct any technical deficiencies in Mr. Bleich's report.[7]

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment [28] is **DENIED**.

**IT IS HEREBY ORDERED** that Defendants' Motion for Leave to File Their Motion to Strike the Expert Report of Kristopher Bleich [63] is **GRANTED**, but that the Motion to Strike the Expert Report of Kristopher Bleich is **DENIED**. The Court gives Plaintiff seven (7) days to correct any technical deficiencies in Mr. Bleich's report.

---

[7] Defendants claim that Mr. Bleich's report should be stricken because it is not signed and because the report does not have a statement of the compensation to be paid for his study and testimony. This information has already been provided to Defendants (ECF No. 65 at 7-8), but the Court formally orders Plaintiff to provide a supplemental report to Defendants.

Dated this 29th day of August, 2014.

_____
**JOHN A. ROSS**
**UNITED STATES DISTRICT JUDGE**